## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **NICOLE GUERRERO,** | § | |
| **PLAINTIFF** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **WICHITA COUNTY, TEXAS,** | § | |
| **SHERIFF DAVID DUKE,** | § | **CASE NO. 7:14–CV–58–O** |
| **CORRECTIONAL HEALTHCARE** | § | |
| **COMPANIES, INC., &** | § | |
| **LADONNA ANDERSON,** | § | |
| **DEFENDANTS** | § | |

### SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, Nicole Gurrero and with Leave of the Court files this

*Second Amended Complaint*.

Respectfully submitted,

By: /s/*Rickey G. Bunch*
Rickey G. Bunch
Bar No. 00792381
2110 Hiawatha Blvd.
Wichita Falls, Texas 76309
Telephone: (940) 322-6611
Facsimile:  (212) 954-5533
rickbunch@sw.rr.com

CERTIFICATE OF SERVICE

I certify that on July 15, 2014, I filed the foregoing document electronically with the Clerk of the United States Court of the Northern District of Texas.  The Court's ECF system will automatically generate and send by e-mail a  Notice of Docket Activity to all registered attorneys currently participating in this case, constituting service on those attorneys.

I further certify that on July 14, 2014 I was contacted by Attorney Vernon L Krueger, Attorney for Correctional Healthcare Companies ("CHC") and he verified that Correctional Health Care Management, Inc. no longer exist and that CHC is a proper defendant in this case. I further certify that on July15, 2014 a true copy of this document was e-mailed to Mr. Kruger at vernon@kbbllp.com

/s/ *Rick Bunch*
Rickey G. Bunch

2

Table of Contents

I.     Introduction..................................................................................................... 4.

II.    Parties. ............................................................................................................. 6.

III.   Personal Jurisdiction....................................................................................... 7.

IV.   Subject Matter Jurisdiction............................................................................. 7.

V.    Venue. ............................................................................................................. 8.

VI.   Factual Background......................................................................................... 8.

VII  History of Constitutionally Inadequate Medical Care . ...................................... 11.

       A.    Jason Ray Brown....................................................................... 12.

       B.    Wilbert Lee Henson................................................................... 14.

       C.    Chelsea Bowden........................................................................ 17.

       D.    Charles Gollihar........................................................................ 17.

       E.    John Tremane Cameron.............................................................. 20.

       F.    Rebecca Tellez. ......................................................................... 21.

VIII Systemic Failures............................................................................................ 24.

IX.   Improper use of LVN's. .................................................................................. 28.

X.    Lack of constitutionally adequate maternal care............................................. 30.

XI.   Deliberate Indifference of Jail Staff. .............................................................. 31.

XII.  Contractors..................................................................................................... 32.

XIII. Causes of Action. ........................................................................................... 36.

XIV  Prayer for Relief. ........................................................................................... 41.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| NICOLE GUERRERO, | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | |
| | § | |
| WICHITA COUNTY, TEXAS, | § | |
| SHERIFF DAVID DUKE, | § | CASE NO. 7:14–CV–58–O |
| CORRECTIONAL HEALTHCARE | § | |
| COMPANIES, INC., & | § | |
| LADONNA ANDERSON, | § | |
| DEFENDANTS | § | |

**SECOND AMENDED COMPLAINT**

I.

INTRODUCTION

1.01    Plaintiff, NICOLE GUERRERO ("Plaintiff" or "Nicole"), brings this civil rights

action against Defendant WICHITA COUNTY ("The County"), and Defendant WICHITA

COUNTY SHERIFF DAVID DUKE ("Duke") and their contractor for inmate medical

care CORRECTIONAL HEALTHCARE MANAGEMENT, Inc., ("CHM") a wholly owned

subsidiary of CORRECTIONAL HEALTHCARE COMPANIES, INC., ("CHC")[1] pursuant

to 42 U.S.C. §1983 of the United States Code.  As described more fully below, the

County, the Sheriff, CHC and/or their officers, agents, contractors, and/or employees

have subjected Plaintiff to unconstitutional conditions of confinement and  acted with

deliberate indifference to deny Plaintiff and her unborn child with constitutionally

---

[1]According to the Texas Secretary of State CHM is no longer an active corporation registered
with the state. CHM has merged with CHC which is an active corporation registered and operating in the
State of Texas. Any references to CHC throughout this pleading also include its wholly owned
subsidiary CHM where applicable.

4

adequate medical care to her serious medical condition which resulted in the death of Nicole's unborn child and cause Nicole immense physical pain and suffering and horrific mental anguish, violating Nicole's due process rights under the Fourteenth Amendment of the United States Constitution. Plaintiff also brings a state civil action against Defendant CHC and their employee Defendant LADONNA ANDERSON ("ANDERSON"), for breaching the duty of care owed to Nicole and her unborn child, and committing medical malpractice.

II.

**PARTIES**

2.01    Plaintiff is a United States citizen and resident of Wichita County, Texas.

2.02    Defendant Wichita County, is a governmental entity doing business in the state of Texas. Wichita County maintains its principal place of business at 900 Seventh Street, Wichita Falls, 76301, and is a county government domiciled in Wichita County, Texas. Wichita County owns and runs the Wichita County Jail, and as such, is required by Texas state law to provide safe and suitable jails for the county and a proper defendant in this suit. TEX. LOC. GOV'T CODE § 351.001  At all relevant times, Defendant Wichita County, by and through its officers, agents, and employees, was acting under color of law. Wichita County may be served by serving Hon. Woodrow Gossom, Wichita County Judge, 900 Seventh Street, Room 202, Wichita Falls, Texas 76301

2.03    Defendant Duke, in his official capacity is the duly elected and duly sworn sheriff of Wichita County, Texas. Since January 1, 2009, and at all relevant times herein, Duke was the keeper of the county jail and required by Texas state law, to safely keep all prisoners committed to the Wichita County jail. *See* TEX. LOC. GOV'T CODE § 351.041.

5

Prior to and during the time giving rise to Plaintiff's claims, Duke was the final policymaker for Wichita County with respect to all matters concerning the care and custody of inmates in the Wichita County Jail. Furthermore, at all relevant times, Duke had final approval over all of Defendant CHC's staff, employees, agents, and/or subcontractors. At all relevant times, Defendant Duke was acting under color of law and maintained final supervisory control over CHC as well as Defendant Anderson. Defendant Duke may be served at the Wichita County Sheriff's Office, 900 Seventh Street, First Floor, Wichita Falls, Texas 76301.

2.04   Defendant LaDonna Anderson ("Anderson"), is an individual and a citizen of the State of Texas. She was, at all relevant times, a licensed vocational nurse for the Wichita County Jail and an agent, and employee for  Correctional Healthcare Companies (CHC). Defendant may be served with process by serving CHC at 6200 S. Syracuse Way #440 Greenwood Village, Colorado 80111. At all relevant times, Defendant Anderson was acting under color of law.

2.05   Defendant Correctional Healthcare Companies ("CHC"), is a foreign for-profit corporation, which is authorized to transact business in the State of Texas. At all relevant times, Defendant CHC was under contract with Wichita County[2] to provide for the delivery of medical care to individuals in the Wichita County Jail in accordance with applicable law, and administering correctional healthcare services and providing medical and healthcare personnel, including Defendant Anderson. Final approval for this contract agreement was granted by Sheriff Duke. At all relevant times, Defendant

---

[2]The original Agreement for Jail Health Care Services at the Wichita County, Texas was with Correctional Healthcare Managment, Inc. ("CHM") which has fully integrated with Correctional Healthcare Companies, Inc. ("CHC") in July 2011. *See* jailcare.com/why-chc/310-company-history.

CHC, by and through their officers, agents, and employees, including Defendant

Anderson, was acting under color of law. Defendant CHC may be served with process by

serving its registered agent, CSC–Lawyers Incorporating Service Company, 211 E

Seventh Street, Suite 620, Austin, Texas 78701-3136 USA.

III.

## PERSONAL JURISDICTION

3.01    Defendants have systemic and continuous contacts with the State of Texas, and

this civil action arises from damages that are a result of those contacts and activities.

Therefore, this Court has general jurisdiction over Defendants for all matters in which

they are a party, and specific jurisdiction over Defendants for the claims raised in this

civil action. Moreover, Plaintiff is also a resident of the State of Texas.

IV.

## SUBJECT MATTER JURISDICTION

4.01    In this civil action, Plaintiff is suing Defendant Wichita County, Defendant Duke,

and Defendant CHC, under federal law, § 1983 of Title 42 of the United States Code, and

for violating the Plaintiff's rights guaranteed to her by the Fourteenth Amendment of the

United States Constitution.  To the extent this civil action arises under federal law, this

Court has subject matter jurisdiction pursuant to § 1331 of Title 28 of the United States

Code (federal question jurisdiction).

4.02    Plaintiff also brings Texas medical mal-practice claims against Defendant

LaDonna Anderson and her employer CHC. This court has supplemental jurisdiction

over Plaintiffs' state law claims pursuant to 28 U.S.C.§ 1367 because the claims are part

of the same case or controversy as Plaintiff's federal claims.

7

V.

**VENUE**

5.01    Venue is proper in the U.S. District Court for the Northern District of Texas,

Wichita Falls Division, because the unlawful acts alleged below were committed therein.

VI.

**FACTUAL BACKGROUND**

6.01    On June 2, 2012, Plaintiff, Nicole Guerrero  was arrested by the Wichita Falls

Police Department for a possession charge, and was booked into the Wichita County Jail,

downtown facility. Nicole was pregnant and in her third trimester  at the time of her

arrest.

6.02    On June 11, 2012, Nicole had an appointment with her OB/GYN, Dr. Ghanbari, at

his clinic outside the jail. Dr. Ghanbari measured Nicole's stomach and listened to the

baby's heartbeat. Dr. Ghanbari told Nicole that the baby was fine and that she was 34

weeks pregnant. At this appointment, Dr. Ghanbari also prescribed Flagy to treat Nicole's

vaginal infection, and iron tablets.

6.03    Upon information and belief, at approximately 6:30 p.m. on June 11, 2012, Nicole

began experiencing lower back pain, cramps, heavy vaginal discharge of fluids, and light

pink blood. Subsequently, Wichita County Jail detention officers escorted Nicole to the

nurses' station, where "LVN Amanda" a LVN and employee of CHC, listened to the baby's

heartbeat, and informed Nicole that the heartbeat sounded fine. Nicole then asked LVN

Amanda about what warning signs she should be aware of, and the LVN Amanda told

Nicole that she should be concerned when she bleeds through two (2) full pads. After this

exchange, another LVN "LVN Josey" gave Nicole the Flagyl pills Dr. Ghanbari

8

prescribed, and returned Nicole to the general population cell on the 4th floor of the county jail.

6.04    Upon information and belief, at approximately 11:00 p.m., June 11, 2012, after lock-down, Nicole began experiencing increasingly painful cramps,  contractions and severe lower back pain. Recognizing that something was wrong, Nicole pushed the medical emergency button, seeking assistance for her worsening condition. Nicole continued to push the medical emergency button, but her requests for help were ignored until 3:30 a.m. At that time, Wichita County Jail detention officers removed her from her cell and took her back to the nurses' station.  Nicole was not examined at this time, although Nicole showed Defendant Anderson, LVN,  her used sanitary napkins, filled with blood and fluids. Defendant Anderson told Nicole the reason for the discharge of fluids, spotting, and cramps was because the four (4) Flagyl pills prescribed by Dr. Ghanbari, were "getting the infection out. The pills were doing their job."  Subsequently, detention officers escorted Nicole to the "cage," a solitary holding cell near the nurses station and Nicole was given only a mat to lay on. Shortly thereafter, Nicole's pain worsened, and she began to experience intense pressure in her rectum. Nicole, in obvious distress, began to moan, scream, and cry. She also attempted to talk herself though this ordeal, since she was not receiving any medical assistance.

6.05    Upon information and belief, while Nicole laid in excruciating pain, moaning and screaming, Defendant Anderson told her "It's ok, Nicole. Take a deep breath."  Defendant Anderson, LVN, also told Nicole that she had called Dr. Ghanbari and told him about the symptoms Nicole was experiencing. According to Defendant Anderson, Dr. Ghanbari decided that Nicole wasn't having labor pains, and that she was fine.

6.06    Upon information and belief, Nicole remained in the "cage," where she continued to moan, cry, and ask for help, which caused the jail trustees to laugh and ask the detention officers "What are y'all going to do with her?" They also suggested that the detention officers move her to solitary confinement because her screams and moans were irritating them. Meanwhile, medically untrained detention officers were walking by the cage every 15 minutes and writing something on a sheet of paper that was stuck on the wall in front of the cage.  Nicole could here some detention officers talking amongst themselves, with some asking how long Nicole had to remain in the "cage," since she had been in there for 45 minutes.

6.07    Upon information and belief, at 5:00 a.m. while the trustees and guards were serving breakfast to the other inmates, Nicole felt a gush of fluids discharge from her vagina. At this time, Nicole heard Defendant Anderson state that she was going to go do "sugar checks" on the male inmates up on the fifth floor of the county jail. Realizing that Defendant Anderson would be walking by, Nicole called out to her and pleaded for Defendant Anderson to look at the blood and fluids on and around Nicole. Defendant Anderson did not look at Nicole. Instead, Defendant Anderson told Nicole that she would "be right back," and walked away.

6.08    After this last encounter with Defendant Anderson, the pressure in Nicole's rectum became so severe that she undressed and checked her vagina for the baby's head. Simultaneously, Detention Officer "Boyd" walked by and Nicole asked her to confirm if what Nicole felt was in fact the baby's head. Detention Officer Boyd looked, and determined that it was a baby's head protruding from Nicole's vagina.

6.09    The pressure became so severe that Nicole could no longer keep from pushing.

10

Therefore, while in the "cage," Nicole delivered her baby daughter, and Detention Officer "Boyd" held the baby. The baby was dark purple, and had the umbilical cord wrapped around her neck.

6.10    Upon information and belief, several minutes later, Defendant Anderson entered the "cage," and took the baby from Detention Officer "Boyd," and told Nicole "Just to let you know, I had to unwrap the cord from the baby's neck, and as long as we don't cut the cord, she's gonna have some bit of oxygen to help her." Defendant Anderson then proceeded to wrap the baby in Nicole's inmate towel, but did not make any attempt to revive her by CPR or any other method, although the baby was unresponsive and had a dark purple complexion. Instead, Defendant Anderson simply patted the baby lightly on her back until the ambulance arrived, approximately 20 minutes later.

6.11    When the EMTs arrived, they cut the baby's umbilical cord and tried to revive her, but she remained unresponsive. They took the baby to United Regional Healthcare Systems.

6.12    Nicole remained in the "cage", where she had to deliver the placenta. Afterwards, Nicole was also taken to United Regional Healthcare Systems.

6.13    The baby, Myrah Arianna Guerrero, was pronounced dead on June 12, 2012, at approximately 6:30 a.m., at United Regional Healthcare Systems.

VII.

**HISTORY OF CONSTITUTIONALLY INADEQUATE MEDICAL CARE**

7.01    Tragically, Nicole was not the first Wichita County inmate to experience the deliberate indifference to serious medical needs that the County, its Sheriff and their contract medical providers have shown over the years. The following cases are only a few

11

among the many incidents that have cause great harm, suffering, and even death because of constitutionally inadequate medical care in the Wichita County Jail.

A.

## JASON RAY BROWN

7.02    Jason Ray Brown was booked into the Wichita County Jail in July 2004, and informed the Jail staff that he suffered from various medical problems, including autoimmune chronic hepatitis, esophageal varices, jaundice, enlarged spleen, and anemia. These were serious medical problems were not covered by any County protocol or physician's standing orders. Consequently, while in the holding tank with other inmates, Brown began to throw up blood. Inmates called for help on Brown's behalf, and a detention officer came into the cell and saw a puddle of blood on the floor. The detention officer called the on– call nurse, "LVN KRAJCA" at home and informed her of Brown's condition.  LVN Krajca asked the detention officer if he actually saw Brown throw up blood. He responded that he had to clean it up. Instead of seeking immediate medical attention for Brown, or going to the jail to assess Brown, LVN Krajca instructed the detention officers to provide Brown with antacids, and later suppositories, without having ever seen him, and while his condition continued to deteriorate.  After Brown continued to suffer in the holding tank, the LVN Krajca finally arrived in the early hours of June 23, 2004, and had detention officers take Brown to a medical solitary cell, away from the inmates who had been serving as his voice throughout this ordeal.  After trying unsuccessfully to give Brown a suppository, the LVN Krajca left him to his own devices locked up  in a segregation cell.

7.03    Brown remained virtually unattended in the solitary cell for 20 hours, in

12

excruciating pain.  No one came into the room to physically check on Brown's condition. However, detention officers did "check on" Brown through the bean hole in the cell door. Unfortunately, after hours of suffering alone in medical solitary, Brown was discovered dead on June 24, 2007. The Tarrant County Medical examiner stated that it was unclear how long he had been dead in the cell.

7.04   Consequently, Janis L. Brown sued Wichita County, the Sheriff and the contract medical provider  over Brown's death. Although this Court affirmed the district court's decision which upheld summary judgements for Wichita County and the medical provider, it also stated:

> "Although we reach these conclusions based on the facts available to Dr. Bolin and the County at the time of Brown's incarceration, this holding is not approval of the medical care provided by Dr. Bolin or the Wichita County Jail. As pointed out by the plaintiffs, there have been two documented cases of improper assessment by the nursing staff at the jail since Brown's death which could be viewed as evidence that the nurses do not have the proper training to recognize critical medical situations. These incidents may be sufficient to put the Sheriff, Dr. Bolin, and the County on notice that their present policies may be likely to endanger the constitutional rights of the inmates in the Wichita County Jail."

*Brown v. Bolin,* 11-10511 slip op. at 14 (5th Cir. December 12, 2012 ).

7.05   At the time of Mr. Brown's death, Duke was the chief investigating officer for the Sheriff's Department and through his internal investigation of Brown's death, Duke discovered that nurse intimidation by the contracted jail physician and his *de facto*

policy of not sending seriously ill inmates to the hospital were contributing factors in the failure of providing Brown with needed medical care which resulted in Brown's ultimate death.

## B.

### WILBERT LEE HENSON

7.06    Mr. Wilbert Lee Henson was booked into custody on November 23, 2004 not more than 4 months after Jason Brown's death. During book-in, Mr. Henson notified the booking officer that he had a history of hyper--tension, Chronic Obstructive Pulmonary Disease (COPD); was resently diagnosed with pneumonia and emphysema; and was prescribed several medications. Two days before his arrest, Henson had been treated for his pneumonia and was discharged from the hospital with specific instructions to return to the hospital if he experienced "1) Any increase in shortness of breath; 2) Any development of chest pain, dizziness, or fainting; or 3) Any change or worsening in your symptoms."

7.07    Just three hours after being booked in, Henson complained that he was having difficulty breathing. The on duty jail Nurse George, LVN ("LVN GEORGE") went to the "bull pen" where Henson was being held. LVN George improperly "assessed" Henson through the cell bars and claimed to take his vital signs but failed to document the results.[3] LVN George reported on a "pink card" used by inmates to request medical treatment, that Henson was "yelling and screaming" that he was having difficulty breathing. Although it was the Sheriff's written policy to send inmates with breathing

---

[3] During Deposition, George testified that she took Henson's blood pressure but did not record it because it was in "in the normal range". But when asked what was normal blood pressure for a 61 year old African-American male, George did not know.

difficulty to the ER and Henson's discharge instructions from the ER advised that he return to the ER if he had breathing difficulty, LVN George in keeping with the Jail's well-established, widespread custom, practice, and unwritten policy not to send inmates to the ER, delayed Henson's treatment by placing Him on sick call to see the contract jail physician the following day. However, Henson was transported to the County Jail Annex the that evening and was not returned to the main jail to be seen by the jail physician on the following day.

7.08    LVN George claimed that she contacted the Annex nurse Anita Clay, LVN ("LVN CLAY")on the following day and advised her of Henson serious medical condition. However there were no records, medical or otherwise, indicating that LVN Clay had been contacted or otherwise made aware of Henson's serious medical condition.

7.09    As days passed, Henson's condition continued to worsen and his fellow inmates repeatedly complained to jail staff that Henson needed to go to the hospital. On his fourth day in jail, Henson told a detention officer that he needed a breathing treatment. The detention officer check his file and did not see any medical instructions allowing Henson to have a breathing treatment. Later, the detention officer saw Henson again and Henson pleaded with the detention officer, complaining that his personal nebulizer was not working and his condition was getting worse . There were no LVNs on duty and the Jail physician cancelled his regularly scheduled sick call at the Annex for that day. The guard had the on-call nurse Krajca, LVN ("LVN Krajca") contacted and she went to the Annex to see Mr. Henson. This LVN Krajca spent lees than 10 minutes with Henson but claimed that she took his vital signs[4], gave him a breathing treatment,

_____

[4]LVN Krajca claimed that she did not record Henson's vital signs because they were in the "normal range." At deposition LVN Krajca also could not identify what was normal blood pressure for a 61 year old African-American male.

15

and prescribed that Henson receive a breathing treatment every 4 hours. Henson only received

twelve (12) breathing treatments over the next and final 86 hours of his life, averaging little more

than one every seven (7) hours.

7.10    On his fifth day in jail, Henson was seen by a Nurse Tweed LVN ("LVN TWEED") who

spoke to Henson through the bars of his cell. He told the LVN Tweed that he had been to the

emergency room a few days earlier for pneumonia and was given an antibiotic but had run out his

medicine. Coleman simply refilled his prescription for an antibiotic.

7.11    Later that evening, Henson was given a breathing treatment by one of the guards and

returned to his cell. Just fifteen minutes latter, pushed the emergency intercom button in his cell

and told them that he was still having breathing problems and requested help. The only nurse on

duty was LVN George he saw after he was booked in and she was at the main jail across town

and was getting ready to end her shift. The Annex jail supervisor advised the LVN George, over

the telephone, that Henson was still having breathing problem just after a breathing treatment.

She simply told the supervisor to place Henson in a solitary cell and "watch" him every 15

minutes.  LVN George gave no instruction as to what the detention officers were to be watching

for. The Annex supervisor then called LVN Krajca who had previously ordered the breathing

treatments, and ask her  for a second opinion. She requested that his vital signs be taken and it

was reported to her that his blood pressure was dangerously high 208 over 107, his pulse rate of

92, and it was noted that he was sweating heavily. LVN Krajca simply told the supervisor to leave

him in solitary confinement and "watch him" every 30 minutes. Again not advising what they

should be looking for.

7.12    After bing watched by medically untrained detention officers for 30 hours, Mr. Henson

notified the staff that he was in trouble by pushing the emergency call button. He was so short of

16

breath that the officer could not hear him speak through the intercom. When the Jail Staff entered Henson's cell, they reported that the inmate was gasping for air and said, "I'm not going to make it". Nevertheless, just as with Jason Brown, the Jail guards and nurses did absolutely nothing to provide any meaningful assistance. Mr. Henson was not sent to the hospital nor was the Jail physician called. Instead, the jail staff, pursuant to the Sheriff's and County's policy called the on-call Nurse Rose Ingram LVN ("LVN Ingram") who was also happened to be the nurse supervisor. This was LVN Ingram, to deal with Henson's chronic illness in six days. Rather than immediately having Henson sent to the ER, LVN Ingram ordered that Henson be moved to a treatment area for another breathing treatment. While LVN Ingram was on the phone with the Annex supervisor, Henson died surrounded by five jail guards fanning him with a tupper-ware lid, trying to give him a breathing treatment. Only after Henson collapsed to the floor LVN Ingram order that the Annex Supervisor call 911.

7.13    During the six days that Henson was confined in the County Jail, five different LVNs either personally saw Henson or were contacted by telephone and advised of his serious medical condition. Not once did any of these nurses recognize his critical medical situation and bother to contact a physician or allow him to go the hospital.

7.14    After Brown and Henson's death there was never a meeting with the Sheriff and the contract jail provider, or other county officials to discuss the reasons why these needless death had to occur in the County Jail.

C.

**CHELSEA BOWDEN**

7.15    In April 2007, Chelsea Bowden was booked into the Jail, pending transfer to a Texas Department of Corrections intermediate facility for an alleged parole violation. Although healthy

17

upon arrival at the Jail, during her incarceration, Bowden began to suffer from ulcerative colitis, and from May 7, 2007 until her transfer on May 30, 2007, Bowden's ulcerative colitis went undiagnosed and untreated, and consequently worsened. Although Bowden complained of dizziness, nausea, severe abdominal cramping, and persistent bloody stool, Bowden was not examined by a doctor, or sent to the hospital for treatment. Instead, Bowden was given haemorrhoid medication and laxatives as treatment, which did nothing for her ulcerative colitis. Unfortunately, her condition and corresponding pain continued to worsen due to non-treatment, and Bowden became septic and unconscious. Bowden suffered from a perforated bowel, a common threat of untreated and undiagnosed ulcerative colitis. Due to the lack of medical care at the Jail, Bowden required a colostomy, which she will have the remainder of her life.

D.

### CHARLES GOLLIHAR

7.16   In March 30, 2007, at approximately 11:00 p.m., Douglas Charles Gollihar was dining at an I-Hop restaurant when he suffered a mild peripheral and cerebral atherosclerosis (stroke). Wichita Falls Police Officers were dispatched to the restaurant, and because they found Gollihar incoherent, and without any other corresponding information of Gollihar's suspected intoxication, Gollihar was arrested for Public Intoxication and transported to the Jail. At approximately 11:45 p.m., Gollihar was delivered into the custody of Wichita County Detention Officer who conducted a custodial search of Gollihar. However, because Gollihar was severely ill and incoherent, the Detention Officer could not complete the book-in-process. Instead of rejecting Gollihar's detention and remanding him back to the arresting officers for transportation to the hospital due to his objectively serious health condition, the Detention Officer  conferred with the watch supervisor and decided to place Gollihar in a holding cell to "sleep it off." With no training

18

on recognizing or assessing the symptoms of diabetic seizure, stroke, alcohol poisoning or any other medical condition that can be confused with ordinary intoxication, the detention officers tried to arouse Gollihar, but he remained unresponsive. The detention officers also noted that Gollihar had a weak pulse, and very shallow and laboured breathing. Unfortunately for Gollihar and the other seriously ill inmates at the Jail, there was no medically trained personnel on duty at the Jail from 11:00 p.m. to 7:00 a.m, pursuant to Wichita County Policy. Therefore, Gollihar's life-threatening medical condition went untreated.

7.17    Due to Wichita County's pervasive practice and custom of discouraging the Jail staff from calling the jail physician or emergency medical services regarding severely ill inmates, the detention officers instead called the "on call"nurse,  LVN George. They subsequently deferred all medical decisions to LVN, which was consistent with the Wichita County Policy to allow LVN's to preform initial triage or independent medical assessments of inmates on an "on call" basis, regardless of the fact that without proper supervision from a registered nurse or duly licensed physician, this is a violation of Texas State law and the Nurse Practice Act. Moreover, because of Wichita County's well-established, widespread custom, practice, and unwritten policy of nurse intimidation and discouragement from seeking medical care for inmates, the LVN did not instruct the detention officers to call EMS.

7.18    Consequently, the LVN George further delayed the necessary medical care for Gollihar until she arrived at the jail approximately forty-five (45) minutes later. Meanwhile, the detention officers did not contact EMS or attempt any other life saving measures until after Nurse George arrived.  Upon her arrival, Nurse George decided that EMS should be called, and Gollihar was finally transported to the hospital, where he later died. An autopsy of Gollihar performed by the Tarrant County Medical Examiner, concluded that Gollihar died from complications of

19

congestive heart failure, Chronic Obstructive Pulmonary Disorder (COPD), cerebral

atherosclerosis, hepatic steatosis (fatty liver disease), arteriolar nephroscieresis, and chronic

gastritis. Moreover, the autopsy results showed that there was no alcohol in his body.

E.

### JOHN TREMANE CAMERON

7.19    On June 10, 2009, John Tremane Cameron was detained in front of his home by Wichita

Falls police officers because he allegedly "pulled his pants down and exposed his butt" to a

woman.  In the midst of their investigation of this incident, the officers were informed that

Cameron had called 911 when there were no emergencies, and used inappropriate language with

the dispatchers. Consequently, Cameron was arrested and booked into the Jail. Upon information

and belief, shortly after his incarceration, Cameron exhibited bizarre, combative behaviour,

including threats of suicide. Rather than seeking medical attention for Cameron's obvious mental

problems, jail officials physically restrained him and placed him on suicide watch in solitary

confinement (a room that is not visible to other inmates or control room operators that can only

be viewed through a small slit of glass in the cell door. This slit is usually covered by a piece of

paper that requires detention officers to raise the paper to view the inmate inside) without any

clothing, mattress, or blanket for several days.

7.20    During Cameron's solitary confinement, he refused to eat or drink. *Id.* The Jail staff was

aware of Cameron's starvation and dehydration, yet failed to share this information with the Jail's

medical staff. On June 23, 2009, at 10:27 a.m., a Detention Officer was conducting his routine

rounds, checking on inmates who were in solitary confinement. He looked through the slit of

glass on Cameron's's cell and reported that Cameron was lying on the floor of his cell. On his

next round at 10:44 a.m., the Detention Officer once again found Cameron on the floor and

"unresponsive." Consequently, Yeager called the control room operator and requested assistance from the on duty LVN.

7.21    Upon her arrival, the LVN administered an ammonia inhalant to Cameron with no response. She then requested an ambulance, and thirty minutes after Cameron was found laying naked on the floor, an ambulance was called. Unfortunately, it was too late for Cameron, and he was pronounced dead at the hospital. An autopsy was performed by Dr. Nizam Peerwani of the Tarrant County Medical Examiner's Office. Dr. Peerwani concluded that Cameron's death was caused by: (1) sudden cardiac death with ischemic heart disease, and (2) dehydration. Furthermore, Dr. Peerwani reported that Cameron weighed 126 pounds at the time of his death; twenty-four pounds less than his noted book-in weight of 150 pounds, recorded thirteen days earlier. *Id.* Lastly, Cameron's stomach was "devoid of food particles." In other words, Cameron was allowed to starve himself to death. Although the Jail Staff knew that Cameron was not eating they failed to notify the medical staff of his starvation.

F.

**REBECCA TELLEZ**

7.22    Rebecca Tellez was incarcerated in the Jail as a pretrial detainee from December 18, 2010 through February 2011. Tellez was housed in the Jail's Downtown facility, on the fifth floor of the Wichita County Courthouse, and in mid January 2011, the fifth floor had an infestation of spiders. Consequently, Tellez was bitten by a spider on her upper left leg, near her groin area. Tellez immediately and for several days thereafter, made requests to see a physician, and although her bite festered and grew extremely painful, her requests were ignored.  On information and belief, during the time of Tellez's incarceration at the jail, a physician was to hold two doctor's clinic a week at the Downtown facility. However, the physician would only hold one doctor's clinic per

week.

7.23     On February 4, 2011, two weeks after the spider bite occurred, two female detention officers took Tellez to the nurses' station for what Tellez believed to be a regularly scheduled doctor's clinic. However, unbeknownst to Tellez, she was being sent to Jail's newly appointed Health Service Administrator for CHC and just recently licensed as a Registered Nurse Allison Smith RN. ("RN SMITH"). Because RN Smith was wearing "street clothes" instead of the surgical scrubs normally worn by the Jail's nurses, she did not identify herself as a nurse, and Tellez had requested to be seen by a doctor, Tellez reasonably believed that the RN Smith was a physician. After Tellez informed RN Smith of her spider bite, RN Smith pulled Tellez's pants down, observed the festered area, and sarcastically remarked that it "looked more like a meth-bite."

7.24     In keeping with the County's and the Sheriff's well established policy not to send inmates to the hospital, CHC's Health Service Administrator, RN Smith decided that she would preform minor surgery and lance the infected area without Tellez's informed consent and without calling or consulting with a physician, and with no written instructions, standing orders, or medical protocols.

7.25     One of the female detention officers implored RN Smith to send Tellez to the hospital instead. RN Smith ignored this suggestion and told Tellez that she was going to give her an injection, then ordered the detention officers to hold Tellez down on the table. LVN Allison Stoddard ("LVN STODDARD") was present in the nurses' station at the time, and immediately left the room when she realized that the RN Smith was about to perform an illegal operation on Tellez.

7.26     Undeterred by the reactions of her colleagues, the RN Smith administered four or five

painful injections into Tellez's groin area, while Tellez screamed and begged for the RN to stop. The RN ignored Tellez's cries, and the cries of one of the female detention officers, and continued to assault Tellez by taking a scalpel and cutting open the infected area. Tellez continued to scream, until she eventually passed out.

7.27    Upon learning of this unlawful practice of medicine by the Jails Health Service Administrator, four LVN's who worked at the County jail filed confidential complaints with the Texas Board of Nursing as required by the Nurse Practice Act. Once the County, the Sheriff, CHC and the RN discovered that the LVN's made these reports all four reporting LVNs were terminated and two were even criminally prosecuted in retaliation for making these confidential reports to the TBN but were acquitted of the bogus allegations.

7.28    The TBN concluded that RN Smith's conduct "exposed the patient [Tellez] to unnecessarily to risk of harm ... and put the patient at risk [of] infection, and deprived the patient's physician the opportunity to institute appropriate medical interventions to stabilize the patient's condition.

7.29    Even though the County, the Sheriff, and CHC learned that their RN Smith was practicing medicine without a license, they took no corrective supervisory action against the RN Smith. In other words, the County, the Sheriff, and CHC all condoned this conduct in keeping with their long-term policies and practices of not only allowing, but actually encouraging the nurses under their control to practice medicine outside the scope of their professional license.

7.30    In keeping with the County's, the Sheriff's and CHC's well established policy of  the nurse intimidation, the nurses who were required by law to report RN Smith's unlawful conduct to the TBN were all consequently terminated from CHC and two of the nurses were subsequently prosecuted by county officials for making copies of the patient's records available to TBN.

23

VIII.

**SYSTEMIC FAILURES**

8.01    For many years prior to Nicole's incarceration, the Wichita County Jail and the Sheriff
have systemically failed and continues to fail to provide constitutionally adequate medical care to
persons incarcerated at the County Jail. The County, the Sheriff, CHC and those responsible for
medical care at the jail, have historically and routinely failed to ensure that persons in custody at
the Jail were promptly evaluated and treated for their medical conditions, with the result that
patients were and are routinely denied constitutionally adequate medical care for their conditions.

8.02    These systemic failures as described herein are deeply imbedded traditional ways the
County, the Sheriff, and CHC carries out inmate medical care in the Wichita County Jails. These
failures are persistent, widespread and closely related to the actual causes of Nicol and Myrah
injuries. These failures include but are not limited to:

(A)    The improper use of LVN's or RN's to practice medicine –Wichita County nurses

do not have the proper training to recognize critical medical situation.  In all of the

aforementioned incidents, Cameron was the only inmate to be seen by a physician and that

was almost two weeks after he was arrested and less than a day before he died. (The

improper use of LVN's are discussed in more detail below).

(B)    Insufficient LVN supervision. – It is the policy of the County, the Sheriff's and

CHC to allow LVN's to work alone without a supervising RN or physician. As discussed

in more detail below, this practice is prohibited by the Texas Board of Nursing ("TBN")

and have contributed to the deaths of Brown, Henson, Gollihar, Cameron, and Myrah,

Nicol's unborn child.

©    Insufficient review of nursing assessment. – Not one of the nurse assessments in

24

the above described incidents were reviewed by a nurse supervisor. In fact Dr. Bolin did not know about the deaths of Brown and Henson until after he had been sued by their respective estates. There was NO review of these deaths by the County Jail's contract medical care provider.

(D)     Insufficient staffing – There is only one RN available to supervise the LVNs. There were no RN's on duty the night Nicole delivered her baby and Anderson was the only LVN at the County Jail at the time. It is believed that Anderson was pre-occupied passing out meds to inmates on another floor when Nicol was in labor;

(E)     Insufficient record keeping; – the records in the each of the above incidents are inadequate, vital signs are not recorded or missing, visual cheeks by detention officer are scant and provide almost no information other than the inmate is either dead or alive. Records are often kept at one location when the inmate is at another location. On–call assessments are not kept in the inmates file;

(F)     Insufficient communications between detention officers and nurses. – At the time of Nicol's labor, the detention staff on her floor did not communicated her critical medical situation with Anderson who was working on another floor passing out meds. In the Cameron incident the detention staff failed to tell the medical staff that Cameron was not eating;

(G)     Failure to provide adequate prenatal care – There was no prenatal care plan for Nicol's labor and delivery, consequently she did not receive the care that she needed;

(H)     The improper use of LVN's to preform on-call assessments – The TBN prohibits LVN for on-call service. The County's "on-call" policy proved to be fatal for Brown, Henson, and Golihar.

25

(I)      The improper use of LVN's as "gatekeepers" for medical care. – It has long been the County's and the Sheriff's policy that before the detention staff can send an inmate to the hospital they must clear it with a nurse on duty. It has also been the policy that the LVN will not approve a transfer to the hospital until she assesses the inmate and then gets approval from the jail physician. As stated before, the Jail nurses or not properly trained to recognize critical medical situation. This multilayered process proved to be fatal for Brown, Henson, Gollihar, Cameron and Nicol's baby;

(J)      Improper policy of assigning medically untrained detention officers to "watch" inmates who have chronic or serious illnesses. – Due to staffing shortage of LVN' and RN's, it has long been the policy of Wichita County, the Sheriff and CHC for medically untrained detention officers to be assigned to "watch" seriously ill inmates who are routinely placed segregation. There are no instructions or advise given to the detention officers as to what they are "watching" for and they are not trained to recognize critical medical situations. Consequently these watches are little more than determining whether the inmate is dead or alive. In the deaths of Brown, Henson, Gollihsr and Cameron, they all died while in segregation being "watched" by medically untrained and unsupervised detention officer who were given no specific instruction as to what they were watching for.

(K)      The improper use of solitary confinement for inmate with chronic or serious illnesses. In each of the above incidents that resulted in the death, the inmate was placed in solitary confinement, away from other prisoners who, in most cases, were acting as the voice for the critically ill inmate(s) and made request for medical assistance on behalf of the critically ill inmates.

26

(L)     The failure to have policies and procedures for late term pregnancy;

(M)     The failure to train detention officers assigned to pregnant female inmates on the recognition of inmates going into labor and treatment needs for safe delivery of the child;

(N)     The failure to provide constitutionally adequate facilities for labor and delivery;

(O)     The failure to provide an infirmary as required by Texas Commission on Jail Standards

(P)     Nurse intimidation – It has long been the policy of the County and the Sheriff and continued with CHC to allow those who are charged with the supervision of the nurses, to intimidate the LVN's by berating, chastising, threatening with termination and even criminal prosecution if the LVN's called the supervisor for instruction, unilaterally sent an inmate to the hospital, or followed the TBN's rules on patient care by reporting patient abuse or neglect to the Board. In all of the case stated above and in the present case, there evidence that LVNs choose not to contact the jail physician or supervisor out of fear of being punished. These fears are evident in all of the above cases.

8.03   These systemic failures were a matter of public record through incidents documented in the records of the Jail, in with County officials regarding operations and conditions at the Jail, through incidents publicized in local media, and through lawsuits initiated against Wichita County and others alleging failures to meet constitutionally required levels of medical care at the Jail, and the failures of constitutionally appropriate policies, procedures, practices and customs which contributed to cause unnecessary pain suffering, neglect, injury and death to persons incarcerated at the Jail.

IX.

**IMPROPER USE OF LVN'S**

9.01     One of the primary causes for the failure to provide constitutionally adequate medical care

in the Wichita County jail is the county's habitual use of unsupervised licensed vocational nurses

("LVN") to practice medicine without a license and serve to as unsupervised "gatekeepers"

between the inmates and physicians.

9.02     For more than a decade, Wichita County, Sheriff and their contract health providers have

insisted that LVNs embark into the practice medicine by exercising independent medical

judgment or medical diagnosis in preforming  inmate medical assessments beyond the scope of

their license and professional training.   On numerous occasions including those discussed above

in section VII, the County's LVNs have made improper assessments of  County inmates which

have lead to the development of more serious medical problems and even death.  *See Brown v.*

*Bolin*, 11-10511 (5th Cir. 12-12-2012) (Noting that LVN's made improper assessments of Brown,

Henson, and Bowden and that the Court did not approve of the medical care provided by Wichita

County and the county was on notice that their present policies may be likely to endanger the

constitutional rights of the inmates in the Wichita County Jail).

9.03     The Texas Nurse Practice Act ("NPA") states that "[The licensed vocational nurse

practice is a directed scope of nursing practice under the supervision of a registered nurse,

advanced practice registered nurse, physician's assistant, physician, podiatrist, or dentist. TEX.

ADMIN. CODE § 217.11(2) (*emphasis added*)  Supervision is the process of directing, guiding, and

influencing the out come of an individual's performance of an activity.  *Id.* In other words, LVNs

are NOT independent practitioners. It is NOT within the scope of LVN practice to function

independently. The LVN must practice under the direction of a licensed physician or Registered

28

Nurse (RN) *at all times*. The definition of "professional nursing" in Texas Occupation Code § 301.002(2) of the Nursing Practice Act (NPA) states that the practice of professional nursing "does not include acts of medical diagnosis or prescription of therapeutic or corrective measures." This means an act must not require the RN, much less the LVN, to exercise independent medical judgment or medical diagnosis, as this is the practice of medicine, not nursing. There is no reasonably related to legitimate penological interest in requiring LVN's to practice medicine or preform task that are clearly beyond the scope of their license and professional training.

9.04   *LVN's "On Call" Status* – It is TBN's position that on-call duties, telephonic nursing, and/or being on-call to handle urgent/emergent issues telephonically are all beyond the scope of practice for LVNs.

23.05  *Inadequate Screening by LVNS* –  The process for evaluation of inmates with chronic illnesses at Wichita County Jail are grossly inadequate. The procedures in place suppress utilization of medical services by virtue of the multiple barriers to access. Virtually none of the chronic illnesses at the Wichita County Jail are ever seen by a physician for a clinical examination appropriate for their condition. Physician orders are obtained on a "crisis management" basis and the clinical diagnosis is solely dependant upon the vocational nurse's assessment or description which may not be accurate. Consequently the Wichita County Jail has a pattern of patients with serious illnesses being described inadequately by nurses and being ignored by physicians For years it was the County's and Sheriff's policy and practice that the preliminary health screening for all prisoner's arriving at the Wichita County jail conducted by medically untrained detention officers. It was also the policy and practice that it was "up to the prisoner to inform the detention officer of any medical condition or disability that required attention, special

accommodation or any medications." This policy proved to be fatal for Mr. Gollihar who could tell the book-in detention officers about his medical problems because he was disoriented. The detention officer thought he was drunk and placed him in solitary to "sleep it off."

9.06    LVNs are not the answer. Even though LVNs may be better than detention officer to screen inmates, the performance of a medical screening exam is not within the scope of practice for an LVN, regardless of years of experience or post-licensure continuing nursing education at the LVN level. As previously discussed above, the NPA § 217.11(2)(A) the scope of practice for an LVN is limited to performance of a focused assessment of an individual client, thus a comprehensive RN nursing assessment is the minimum level of assessment acceptable to conduct a medical screening exam. Even if a physician wishes to delegate assessment of medical conditions and/or treatments to an LVN, the LVN is accountable for only accepting those assignments within his/her scope of practice as outlined in the NPA and in Rule 217.11, Standards of Nursing Practice.

X.

**LACK OF CONSTITUTIONALLY ADEQUATE MATERNAL CARE**

10.01  Wichita County has a jail that regularly houses more than 450 inmates. It is inevitable that there will be pregnant inmates housed in the jail and it is also inevitable that the pregnant inmate will go into labor and deliver a child. Wichita County, the Sheriff, and CHC have preformed with deliberate indifference to this inevitable phenomenon.

10.02  Wichita County, Duke, and CHC have failed to implement appropriate policies that could have prevented Nicole's unnecessary suffering and  Myrah's death and had a

pattern of disregarding the serious medical needs of its inhabitants, and its inaction in

implementing these policies was the result of deliberate indifference to the rights of its

inhabitants, including Nicole and Myrah

Wichita County, Duke, and CHC and have failed to:

(A)      implement polices and procedure to provide adequate medical care for

pregnant inmates;

(B)      have failed to provide adequate pre-natal care for pregnant inmates and

their unborn child;

©       have failed to provide adequate medical facilities for the labor of pregnant

inmates and the delivery of the inmate's child;

(D)      have failed to provide adequately trained or supervised jail and medical

staff on the recognition of inmate labor situations;

(E)      failed to establish adequate procedures for the transfer of inmates in labor

to the hospital or other medical facility.

(F)      failed to adequately train or supervise the jail staff and nurses in labor and

delivery situation.


XI.

**DELIBERATE INDIFFERENCE OF JAIL STAFF**

11.01   Nicole had been an inmate for more than a week and let it be know to all detention

officers in the female section of the jail that she was in the late terms of her pregnancy.

For several hours before she delivered Myrah in a prisoner's cage, Nicole pleaded, cried,

and begged for assistance from the detention staff. She constantly pushed the emergency

31

help button to seek assistance which went unanswered by the detention officers.

11.02   It was not until the others inmates became irritated and complained about Nicole's moans and cries before she was moved to a solitary cell away from the general population. Even then the detention officers did little or nothing to help Nicol. None of the jail staff made any effort to have Nicole taken to the hospital or call a physician. Rather the detention officers conducted themselves in the manner that was expected of them by the policies and procedures in place by the County and Sheriff Duke, that is to do nothing except tell the nurse on duty and let her make the call.

11.03   In this case it was clearly obvious to any reasonable person that Nicol was in labor and going to deliver her baby very soon and needed to go to the hospital weather the nurse approved it or not.

11.04   The County, Duke, and CHC are liable to Nicole because they failed to train and supervise the detention officer on recognizing Nicol's and Myrah's critical medical situation. They failed to implement constitutionally adequate policies and procedures on the labor and delivery by pregnant inmates to insure safe delivery of the Nicole's baby.

 11.05   It is apparent that detention officer charged with the duty to keep Nicole and Myrah safe were deliberately indifferent to their critical situation and in keeping with the polices and practices of the County, Duke, and CHC, tried to delay transportation to the hospital until Anderson gave her approval.

## XII.

## CONTRACTORS

12.01. It has been the policy of the County and Sheriff, both prior to and during the time giving rise to Nicole's claims, to contract with an outside medical providers,

such as Dr. Daniel Bolin ("Dr. Bolin")(from 1999 through 2009) and CHC, (since 2010) to provide medical services at the Jail.

12.02. It was the policy of the County and Sheriff, prior to and during the time giving rise to Nicole's claims, to delegate the provision of medical care and the development of constitutionally appropriate staffing levels, policies, procedures. practices and customs to  outside medical providers like Dr. Bolin, and CHC.

12.03. Prior to and during the time giving rise to Nicole's claims, Dr. Bolin, followed by Defendant CHC were the vendors selected by the County and Sheriff for providing medical services and establishing policies for the provision of medical service at the Jail.

12.04  Pursuant to the agreement by and between the County Sheriff and CHC were delegated the County and Sheriff's responsibilities to provide constitutionally appropriate medical care to persons in custody at the Jail.

12.05  Defendant County, and Defendant Duke in his official capacity, recommended and supported the CHC contract.

12.06  Under the terms of the CHC's contract, CHC was to appropriately staff, and establish policies, procedures, customs and practices for the provision of medical and mental health and medical care to persons in custody at the Jail suffering from medical or mental health  conditions.

12.07  Prior to the events giving rise to Nicole's claims, the County and Sheriff were made aware on numerous occasions of gross deficiencies in the provision of medical care at the Jail resulting in the routine denial of reasonable medical care to persons incarcerated at

the Jail and causing serious illness, injury, and death to persons incarcerated at the Jail.

11.08   In addition to Jail records documenting problems with the provision of medical care to persons in custody at the Jail, and in addition to media reports about the routine denial of medical care and illness/ injuries/ death to persons in custody at the Jail due to the denial of medical care, the County, the Sheriff and others were subject to civil suit for injuries and deaths arising at the Jail as a result of the denial of medical care.

12.09   In spite of the knowledge of the County and the Sheriff, to internal documented events that did not result in suit, and in spite of their knowledge of the allegations and sworn testimony regarding the unconstitutional conditions at the Jail which were routinely resulting in the denial of necessary medical care to persons in custody at the Jail, the County, the Sheriff, and CHC continued their policies, procedures, practices and customs without change, and the same problems, policies, procedures, customs, practices staffing and conditions that contributed to cause the injuries and death of Brown, Henson, Golihar, Cameron and others while in custody at the Jail were in effect at the Jail during the time giving rise to Nicole's claims.

(A)    The County, the Sheriff , and CHC does not maintain a regular physician presence or routine to make a physician available to assess and treat the serious medical conditions of persons in custody at the Jail;

(B)    That as a result of routine absence of physicians from the Jail, vocational nurses and Jail staff with no medical training were being required to make medical judgments about the severity of illnesses and to guess at the appropriate care to be provided to persons with serious medical conditions at the Jail;

(C)     That the medical conditions of persons in custody at the Jail were not being timely assessed by an appropriate medical provider;

(D)     That vocational nurses and Jail staff without medical training were routinely prescribing and/or issuing medications to treat the medical conditions of persons in custody at the Jail when such medications may or may not have been appropriate to treat the medical conditions of persons in custody at the Jail who were suffering from serious medical conditions;

(E)     The County, the Sheriff and medical service contractor's routine, policy, and custom at the Jail was to refuse to send persons in custody at the Jail who were seriously ill or suffered with serious mental health illnesses out for medical consults or to the hospital;

(F)     That routine, policy, and custom at the Jail was to discourage the transport of seriously ill persons in custody at the Jail for necessary and appropriate medical consults or to the hospital:

(G)     That policies, customs, and practices, for the provision of medical care at the Jail was to chastise and intimidate Jail and nursing staff and discourage them from contacting the nurse supervisors regarding the medical condition of persons in custody at the Jail or to insist on transport of seriously ill persons in custody at the Jail to receive medical care and treatment for their serious  medical conditions;

(H)     That contractually required meetings to review the provision of medical care to ensure that mental health and medical care was being properly

35

administered to persons in custody at the Jail were not occurring, resulting in the perpetuation of known problems with the delivery of necessary mental health and medical care to persons in custody at the Jail that were routinely leading to the denial of necessary medical care to persons in custody at the Jail;

(I)     That policies, customs and practices at the Jail were to routinely use solitary confinement or other disciplinary measures to isolate and discourage persons with serious medical and/or mental health conditions from requesting medical care for their serious medical conditions while in custody at the Jail; and

(J)     That the routine, policy, and custom at the Jail to intimidate nurses and jail staff, coupled with the Sheriff's failure to supervise and end the intimidation, leads to fear and reluctance amongst Jail staff and nurses to ask for the supervisor's assistance and advise, resulting breakdown of communications between the different shifts of detention staff, nurses, and jail physicians and fosters a willful ignorance of serious medical problems of inmates by Jail staff and nurses.

XIII

**CAUSES OF ACTION**

**42 U.S.C.§ 1983 and The Fourteenth Amendment
As to Defendant Wichita County**

13.01   Plaintiff re-alleges and incorporates by reference herein, all of the

36

allegations contained in the Factual Background section, numbered 6.01– 12.09.

13.02  Defendant Wichita County violated Nicole's clearly established due process rights under the Fourteenth Amendment when it deprived her of access to reasonable medical care, a right guaranteed to Nicole as a pretrial detainee, under the Fourteenth Amendment. Defendant Wichita County denied Nicole access to reasonable medical care when its employees, agents and/or subcontractors, ignored her obvious signs of labor and constant requests for medical assistance, failed to conduct a physical examination of Nicole when she began to display obvious signs of labor, left Nicole unattended in a solitary cell while she was obviously in labor, failed to transport Nicole to the hospital for a safe delivery, which ultimately caused Nicole to deliver her baby alone in the solitary cell, and resulted in Nicole suffering severe and likely permanent, physical and psychological injuries.

13.03.  Defendant Wichita County's actions and/or omissions are the result of well-established customs, policies, procedures, and practices that led to the denial of the obvious medical treatment needed by Nicole, and placed her at high risk of serious harm and/or death, and such risk could have been prevented, but for the inadequate medical care system embraced at the Wichita County Jail. Instead, these actions and/or omissions caused Nicole to suffer severe and possibly permanent physical and psychological harm, and consequently denied Nicole access to reasonable medical care, in violation of the Fourteenth Amendment.

13.04  All of Defendant Wichita County's actions and/or omissions are the result of well- established customs, policies, procedures, and practices that caused

Nicole to linger in agony and suffer through an unnecessarily painful delivery in a jail cell, in violation of her Fourteenth Amendment constitutional rights. Furthermore, Defendant Wichita County has a history of maintaining policies, procedures, practices, and customs that routinely infringe on the constitutional rights of Wichita County Jail inmates. Defendant Wichita County was put on notice regarding its inadequate medical care system at the jail and the need for extensive improvements, by the various law suits filed against Defendant Wichita County by former detainees of the Wichita County Jail,  or their respective estates.

### 42 U.S.C. Section 1983 and The Fourteenth Amendment As to Defendant Duke

13.05.  Plaintiff re-alleges and incorporates by reference herein, all of the allegations contained in the Factual Background section, numbered 6.01–12.09

13.06  During all relevant times, Defendant Duke was the Sheriff of Wichita County, and under Texas law is the "keeper of the jail" charged with the responsibility of implementing the policies, practices, customs, and procedures of the Wichita County Jail and the hiring of its employees, and Defendant Duke was acting within the scope of his employment as sheriff of Wichita County, and under color of law. Therefore, Defendant Duke in his official capacity is liable for the unconstitutional  policies, practices, customs, and procedures, as well as the actions of Defendant Anderson, that denied Nicole her constitutional right to reasonable medical care.

13.06  Defendant Duke, in his official capacity as the final county policy maker

and the individual responsible for the well-being of the inmates at the Wichita County Jail, is responsible for the actions and/or omissions of those employed at the Wichita County Jail. Moreover, Duke and Wichita County have been put on notice of a continued inadequate medical care system which has repeatedly allowed the unconstitutional actions and/or omissions, which are the result of well-established customs, practices, policies, and procedures that led to the deprivation of the obvious medical treatment needed by Nicole, and placed her at high risk of serious harm and/or death. *See, Brown v. Bolin*, 11-10511, slip op. at 14 (5th Cir. 12-12-2012) (unpublished). Consequently, Nicole suffered severe and possible permanent physical and emotional harm.

### 42 U.S.C. Section 1983 and The Fourteenth Amendment
### As to Correctional Healthcare Companies, Inc.

13.07   Plaintiff re-alleges and incorporates by reference herein, all of the allegations contained in the Factual Background section, numbered 6.01–12.09.

13.08   During all relevant times, Defendant Correctional Healthcare Companies were contractor for Wichita County and Sheriff Duke to provid medical care for Wichita County inmates, and assumed responsibility of implementing the policies, practices, customs, and procedures for the care of inmates of the Wichita County Jail, including the Plaintiff, and the hiring of its medical staff employees, and was acting within the scope of their contract with Wichita County and the Sheriff, and operating under color of law. Therefore, Defendant CHC is liable for the unconstitutional  policies, practices, customs, and procedures, as well as the actions of Defendant Anderson, that denied Nicole her constitutional right to

reasonable medical care.

13.09. Defendant CHC is responsible for the well-being of the inmates at the Wichita County Jail, is responsible for the actions and/or omissions of those employed by CHC at the Wichita County Jail. Consequently, Plaintiff suffered severe and possible permanent physical and emotional harm.

### Medical Malpractice As to Defendant Anderson

13.10   The Plaintiff re-alleges and incorporates by reference herein all of the allegations contained the Factual Background section, numbered 6.01–12.09.

13.11   Pursuant to Section 74.051 of Texas Practice & Remedies Code, Plaintiff sent written notice to LaDonna Anderson by certified mail, return receipt requested, at least 60 days before filing this claim. (See Exhibit "A")

13.12.   Defendant Anderson's lack of treatment and various departures from accepted standards of medical care, breached her duty of care owed to Plaintiff, which was the proximate and direct cause of Plaintiff being forced to unnecessarily suffer through the pain of child birth for several hours in a jail cell, consequently giving birth in that jail cell without medical attention, causing the death of the child, Myrah Arianna Guerrero, and resulting in Plaintiff suffering severe and likely permanent, physical and psychological injuries.

### Medical Malpractice As to Defendant CHC

13.13   The Plaintiff re-alleges and incorporates by reference herein all of the allegations in the Factual Background Section, numbered 6.01–12.09.

13.14   Pursuant to Section 74.051 of Texas Practice & Remedies Code, Plaintiff

sent written notice to CHC by certified mail, return receipt requested, at least 60 days before filing this claim. (See Exhibit "B")

13.15.   During all relevant times, Defendant Anderson was an employee of Defendant CHC and/or its subsidiary CHC, and was acting within the scope of her employment at the Wichita County Jail, and under color of law.

13.16.   Defendants CHC are responsible for Defendant Anderson's breach of applicable medical care, which resulted in Plaintiff suffering physical and psychological injuries.

13.17.   As a health care provider, Defendants CHC and  Anderson had a duty to tend to the healthcare needs of the inmates of Wichita County Jail, including Plaintiff.

13.18.   Defendants breached that duty on June 11, 2002-June 12, 2012, when she: (1) ignored the obvious signs indicating that Plaintiff was in labor, (2) ignored Plaintiff's constant requests for medical assistance, (3) failed to perform a physical examination of Plaintiff, (4) failed to immediately transport Plaintiff to a hospital for a safe delivery, and (5)  placed Plaintiff in a solitary cell and left her alone for several hours while she was in labor, and subsequently caused Plaintiff to deliver her baby in the cell, without the appropriate medical assistance, resulting in the death of Myrah Arianna Guerrero, and the severe physical and psychological harm to Plaintiff.

XIV

**PRAYER FOR RELIEF**

14.01  Plaintiff seeks compensatory and punitive damages in the maximum

amount authorized by law.

14.02   Pursuant to 42 U.S.C. §§ 12205, 1988(b), Plaintiff is entitled to recover

attorney's fees, costs, and expenses.

14.03   Any other equitable relief the court deems just.

14.04   In accordance with Rule 38 of the FEDERAL RULES OF CIVIL

PROCEDURE, Plaintiff demands a trial by jury for all issues raised in this civil

action that are triable of right (or choice) by a jury.

Respectfully submitted,

By: _/s/Rickey G. Bunch_
Rickey G. Bunch
Bar No. 00792381
2110 Hiawatha Blvd.
Wichita Falls, Texas 76309
Telephone: (940) 322-6611
Facsimile:  (212) 954-5533
rickbunch@sw.rr.com